CARTER v. KANSAS CITY SOUTHERN RY. CO.

(Court of Civil Appeals of Texas. Texarkana. March 14, 1913. Rehearing Denied April 3, 1913.)

1. MASTER AND SERVANT (§ 111*)—INJURIES TO SERVANT—DUTY OF MASTER.

It is the duty of a railway company to exercise care to equip its cars with attachments for keeping their doors closed to guard against injuries to employés who handle them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. § 111.*]

2. MASTER AND SERVANT (§ 111*)—INJURIES TO SERVANT—APPLIANCES.

A freight car, which a brakeman was required to handle in the ordinary operation of trains, is an appliance when considered with reference to the master's duty to furnish safe implements and appliances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 215–217, 255; Dec. Dig. § 111.*]

3. MASTER AND SERVANT (§ 284*)—INJURIES TO SERVANT—QUESTIONS FOR JURY.

In an action by a brakeman who was injured by being struck by an open car door when he was throwing a switch, evidence held sufficient to go to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1000–1090, 1092–1132; Dec. Dig. § 284.*]

4. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

In general, a servant assumes the risk of injury from all defects and dangers of which he knows, and those which he should, by the exercise of ordinary circumspection, ascertain in the course of his employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

5. MASTER AND SERVANT (§ 180*)—INJURIES TO SERVANT—FELLOW SERVANT RULE.

The federal Employer's Liability Act of 1908 (Act April 22, 1908, c. 149, § 1, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]), providing that every common carrier, while engaging in commerce between any of the several states, shall be liable in damages for any person suffering injury while employed by such carrier in such commerce resulting from the negligence of any officers, agents, or employés of the carrier, abolishes the common-law fellow-servant doctrine.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 359–361, 363–368; Dec. Dig. § 180.*]

6. MASTER AND SERVANT (§ 288*)—INJURIES TO SERVANT—ASSUMPTION OF RISK—QUESTIONS FOR JURY.

Whether or not an employé assumes the risk of a given situation is generally a question of fact for the jury, and the court must submit it, unless the evidence is of such a character

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

that ordinary minds would not differ as to the proper conclusion.

[Ed. Note.—For other cases, see Master & Servant, Cent. Dig. §§ 1068–1077; Dec. Dig. § 288.*]

7. MASTER AND SERVANT (§§ 204, 228*)—NEGLIGENCE (§ 101*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

The contributory negligence of an injured servant will not, under the statutes, completely bar recovery, but will merely lessen it, while, if the injury is caused by a risk assumed by the servant, recovery is wholly barred.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 544–546, 670, 671; Dec. Dig. §§ 204, 228;* Negligence, Cent. Dig. §§ 85, 163, 164; Dec. Dig. § 101.*]

8. MASTER AND SERVANT (§§ 203, 217, 227, 243*)—INJURIES TO SERVANT — CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF RISK DISTINGUISHED.

The doctrine of assumption of risk is predicated upon a contract, express or implied, and is founded upon the knowledge of the servant, either actual or constructive, as to the hazards to be encountered and his consent to take the chance of danger, while the defense of contributory negligence is bottomed on misconduct, consequently a brakeman does not assume the risk of injury from a defective fastening on a car door, unless he knew of its existence, or by the exercise of ordinary care should have known, and for the same reason his violation of the master's rules constitutes contributory negligence and not assumption of risk.

[Ed. Note.—For other cases, see Master & Servant, Cent. Dig. §§ 538–543, 574–600, 668, 669, 682, 759–775; Dec. Dig. §§ 203, 217, 227, 243.*]

9. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT—VIOLATION OF RULES.

A servant, such as a brakeman for a railway company, who violated the master's rule, is not guilty of contributory negligence, as a matter of law, in all cases, for circumstances may create an emergency which will excuse the servant's disregard of the rule.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. § 289.*]

10. MASTER AND SERVANT (§ 247*)—INJURIES TO SERVANT—ACTIONS—DEFENSES.

In an action by a brakeman injured by an open car door while making a switch, the fact that it was a flying switch, contrary to the master's rules, is not a defense, where the mode of making the switch was not the proximate cause of the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 795–800; Dec. Dig. § 247.*]

11. APPEAL AND ERROR (§ 1047*)—HARMLESS ERROR.

In a personal injury action by a servant, where verdict was directed for defendant on the ground that plaintiff assumed the risk, the refusal of the court to put expert witnesses, who were to testify as to plaintiff's injuries, under the rule was harmless, having no effect on the disposition of the case.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4132, 4133, 4146–4152; Dec. Dig. § 1047.*]

12. APPEAL AND ERROR (§ 970*) — REVIEW — DISCRETION — PLACING WITNESSES UNDER RULE.

The propriety of placing any class of witnesses under the rule rests largely in the discretion of the trial judge, and his ruling will not be reversed, except where an abuse is shown.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3849–3851; Dec. Dig. § 970.*]

Appeal from District Court, Bowie County; P. A. Turner, Judge.

Action by C. W. Carter against the Kansas City Southern Railway Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Wolfe, Maxey, Wood & Haven, of Sherman, for appellant. Glass, Estes, King & Burford, of Texarkana, for appellee.

HODGES, J. In this case the appellant, C. W. Carter, seeks to recover a judgment for damages for personal injuries received September 21, 1911, while in the service of the appellee. The pleadings and the evidence show that, at the time of the injury, the appellant was the head brakeman on a local freight train operated by the appellee between Texarkana, Tex., and Shreveport, La. The crew to which the appellant belonged had orders to pick up an empty refrigerator car at Myrtis, La., on their return from Shreveport to Texarkana. When their train arrived at Myrtis, it went in on the siding in order to permit other trains to pass. The car to be picked up was also on the siding, at the north end, and was pushed on north far enough to allow the entire train to clear the main line. The engine was then detached from the train, and this car was pushed on still farther north beyond the switch stand and onto the main line again. Appellant was directed to manipulate the switch in placing the car in its proper position in the train. As the engine and car passed over the switch stand going onto the main line, John Bress, a brakeman who was riding on the pilot of the engine, gave the appellant a signal indicating that they were to make a flying switch in order to get this car on the siding to be incorporated into the train behind the engine. When the engine and car started back south, appellant turned the switch so as to allow the engine to pass on down on the main line. He then immediately reversed the switch in order to throw the refrigerator car on the siding where the train stood. In making this last turn, his back was towards the approaching car. As the car passed, one of the doors was standing open and struck appellant on his shoulders and head, inflicting the injuries of which he complains. The negligence charged is thus stated in the appellant's petition: "(a) In furnishing appellant with defective appliances with which to perform his work in that appellee furnished a car on which there were defective doors, in that the fastenings, which were to keep said doors closed, were old, worn, defective, broken, parts of the same gone, out of repair, and unfit for use, and would not stay closed on account of said defective conditions. (b) That it was the duty of appellee to inspect the car for defects; that the said defective conditions would have been discovered by proper inspection, and that appellee failed to make such

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

inspection." The defendant railway company answered by general denial, a special plea of contributory negligence, and assumed risk, alleging, in substance, that appellant knew of the defects, if any, that were in the car, or by the exercise of ordinary care could have known of them, and of the danger likely to result therefrom, and assumed the risk; that the railway company had promulgated a rule prohibiting a running switch when practicable to avoid it, and, when made, that great care must be taken to prevent accident, and the conductors must attend the switch; that the duty of operating the switch stand on the occasion in question being that of the conductor, the appellant, in undertaking to perform the duty, was guilty of negligence and assumed the risk of injury; that appellee had also promulgated a rule that employés of every grade were required to examine, before using them, the machinery and tools that they were expected to use, and to see that they were in proper condition; that at places where there are no car inspectors conductors must, with the assistance of the trainmen, thoroughly inspect all cars offered and be sure of their safe condition before taking them, and that they must see that the doors of empty cars are closed and securely fastened. It was further alleged that appellee had no car inspector at Myrtis, and this was known to the appellant, and that, with full knowledge of the danger in failing to do so, he made no effort to see that the car doors were closed and fastened; that, in failing to comply with the rules, he was guilty of negligence contributing to his injury, and also assumed the risk. At the conclusion of the evidence, the court gave a peremptory instruction directing a verdict for the railway company, and, from the judgment entered, this appeal is prosecuted.

Carter testified that his train left Texarkana the day before he was injured, and carried this particular car, loaded with ice, to Myrtis, where it was left to be unloaded. Before they arrived at Myrtis on that trip, it was discovered that the doors of this car on one side were open, and that the ice was falling out. The train was stopped and the doors were closed and fastened by the conductor. Carter says the last time he saw this car before the accident it was at Myrtis and was attached to the rear end of another freight train. He denies that he knew, at the time of their arrival at Myrtis on their return from Shreveport, that this was the same car which his crew had carried to Myrtis the day before. He says he never paid any attention to the car; never thought anything about it. This car was equipped with double doors on each side that swung out like those generally used on refrigerator cars. He knew that a refrigerator door, if not fastened, would swing out; that some of them could not be closely shut, and that, if not fastened in some way, they would come open, and were liable to open from a jar or jolt.

John Bress, the swing brakeman, testified that, after their arrival at Myrtis on their return trip, they had orders to take this car back to Texarkana. After coupling to this car, Carter went to the switch, unlocked and threw the switch to let the engine and car out on the main line, and remained at the switch stand. As they pulled by, he gave Carter the trainmen's signal for a running switch. They then pulled up on the main line about four car lengths from the switch. As soon as the engine stopped, they started back. He gave the engineer a slow signal, which afforded an opportunity to uncouple the car from the engine. The car was then rolling, and the engineer started rapidly down the main line and passed on by the switch stand ahead of the car. He saw the car turn in on the passing track; it kept rolling down, and stopped about 50 feet from the head end of the train, and the engine went on down to the water tank. As the refrigerator car, in going in on the passing track, passed Carter, who was standing at the switch stand with his back towards the approaching car, one of the east doors which was standing open struck Carter across the shoulders and the lower part of the neck and knocked him into the switch stand. Just an instant before the door struck Carter, he (Bress) saw the door standing open for the first time. He had no time to give Carter warning before he was struck. He did not see the door fly open, as he was facing the engineer, until after the engine passed over the north passing track switch. When he turned around, the car was going in on the passing track, and he saw the open door just before Carter was struck by it. The car was at the time traveling at the rate of about five miles an hour. As to the fastening on the door and the cause of its coming open, he testified: "This door came open on account of the door being in bad order, due to the lower or bottom part of the lever, with which a refrigerator door is fastened, being broken off. The doors on this car had the same fastenings as are usually on refrigerators; that is, one door fits over the other door and holds the same in place. This door which fits over the other is closed by a lever which extends from the facing above the door to the sill below the door; there being a hasp on the facing and sill to hold the lever. This lever is in two pieces, and each piece is a long, narrow strip of steel or iron. The pieces are held at the center of the door by a rotary connection from which a handle extends. When this handle is pushed upward, the upper strip of iron is pulled down out of the socket on the facing above the door, and the lower strip or lever is pulled up out of the socket on the sill below the door, and, when in this position, the door can be pulled open. When the handle is pulled downward, both levers are pushed into their respective sockets, and this holds the door closed. The bottom part of the lever was missing entirely; it was

broken off right at the handle, and there was no way in which the door could be fastened at the bottom with the apparatus on the door —that is, with the proper fastening. With the bottom part gone, the top could not be held in place—that is, the top part of the lever would work out of the socket through the motion of the train and permit the door to swing open. These doors would fly open or come open through the motion of the train, which worked the upper part of the facing lever out of the socket on the facing above the door; there being no lower part of the lever fastened in the socket on the sill below the door, and therefore no weight on one side of the rotary connection to equalize the natural tendency of the weight of the upper part of the lever to drop downward and out of the socket."

Appellee introduced in evidence the following rules which had been promulgated by the railway company: "General rules on page 4. General rule A: Employés whose duties are prescribed by these rules must provide themselves with a copy." "B. Employés must be conversant with and obey the rules and special instructions. If in doubt as to their meaning, they must apply to proper authority for explanation." "Rule 517, p. 52: A running switch must not be made when practicable to avoid it; but, when made, great care must be taken to prevent accident. Conductors must attend the switch." "519, p. 52: Employés of every grade are warned to see for themselves, before using them, that the machinery or tools which they are expected to use are in proper condition for the service required; and, if not, to put them in proper condition, or see that they are so put, before using them; or secure other tools that are in proper condition in their stead. The company does not wish or expect its employés to incur any risks whatever from which, by exercise of their own judgment and by personal care, they can protect themselves, but enjoins them to take time, in all cases, to do their duty in safety, whether they may at the time be acting under orders of their superiors or otherwise." "724, p. 75: Where there are no car inspectors, conductors must, with the assistance of the trainmen, thoroughly inspect all cars offered and be sure of their safe condition before taking them. They must see that side doors of empty cars are closed and securely fastened."

For the purpose of showing that the car was in proper condition when it left Texarkana on the day previous to the injury, appellee introduced two witnesses, M. T. Letcher and Joe Wilson. Letcher testified that he was the night shipping clerk for the ice plant; that on the night of September 20, 1911, he loaded a car corresponding to the number of this car with ice and sealed it himself, and that, if there was anything wrong with the doors, he did not notice it; that the doors have to be something near

plumb, or they cannot be placed where the loading ground was. When he found anything wrong with cars, or any defects about the doors, he phoned the yard office and asked for another car; that was his custom. He did not phone on that occasion, and, so far as he knew, the car was in good condition. On cross-examination he stated that he was not a car inspector, and that he did not inspect cars to see if they were in condition to be used. All he knew about this particular car is what his record shows. He had no personal recollection as to having anything to do with it.

Wilson testified that he was a car inspector at Texarkana for the Texarkana & Ft. Smith Railway Company; that he inspected the cars that went out on this train, and had a record of the inspection made in his book. His record shows that he inspected a car corresponding to this number on the morning of September 21, 1911, in train No. 35. It was his custom to make a record of every defect he found in the different cars. He made no notes of any defects in any cars found in that train. If he had found any defective cars, he would have made a record of it. He had no personal recollection of having examined the car. He further stated that, if the doors of cars were closed, he would have made no inspection of them; if they were open, he would stop and find out the trouble. On the morning of this inspection, when he walked by the doors were closed, and he kept going. If the bottom catch was gone, and the door was closed, he would not notice it unless he happened to catch it by a glance. Other testimony was offered bearing upon the existence and extent of the injuries sustained by the appellant.

The giving of the peremptory instruction is defended by counsel for the appellee upon the grounds: (1) That the evidence failed to show any negligence on the part of the railway company; and (2) if there was any defect in the appliance for fastening the doors of this car, the risk of injury was assumed by Carter.

[1-3] It was the duty of the railway company to exercise a proper degree of care to equip its cars with attachments for keeping their doors closed, not only for the purpose of preventing the loss of freight, but to guard against accidents and injuries to the employés who were required to handle those cars in the operation of the trains. A failure to exercise that care would be negligence. It is not denied in the evidence that the appliance provided for fastening the doors of this particular car was defective, and that, by reason of that defect, the door came open and caused the injuries complained of by Carter. The question then is, Was the existence of that defect on this occasion due to the negligence of the railway company? The defective condition of the fastenings on this car was indicated by the fact that the doors

flew open on the day prior to the injury, between Texarkana and Myrtis. In the absence of sufficient proof to the contrary, a jury would have been warranted in concluding that this defective condition existed when the car left Texarkana and started on its journey. That conclusion would have justified a finding that the railway company had furnished its servants with a defective appliance. A car which employés are required to handle in the manner adopted in the ordinary operation of trains is an appliance, when considered with reference to the master's duty, to furnish "safe implements and appliances" for the use of his employés. It is immaterial, however, whether the car be regarded as an appliance or as a place where the employés were required to work. In either event, the same degree of caution is required of the master to provide safe conditions for the protection of his employés. For the purpose of rebutting the inference that this defective condition existed when this car left Texarkana, appellée relies upon the testimony of the witnesses Letcher and Wilson. The duty, when starting it upon its journey, to equip this car with appliances for keeping the doors closed rested upon the railway company as the owner, and a failure to perform that duty would support a finding · of actionable negligence, even though there might have been some sort of an inspection. The testimony of these inspectors is not so conclusive as to justify the court in telling the jury, as a matter of law, that the appellee had discharged its duty in that respect. It was the province of the jury to weigh their testimony, pass upon their credibility, and then determine whether or not the inspection made by them was sufficient to exonerate the railway company from negligence. We think the evidence raised an issue as to negligence upon that point, which should have been submitted to the jury.

[4] The next question is, Did the appellant assume the risk of injury from the defective condition of this fastening? The general rule is the servant assumes the risk of all defects and dangers of which he knows, and those, also, which he should, by the exercise of ordinary circumspection, ascertain in the course of his employment. From Carter's testimony, the jury might reasonably have inferred that he was ignorant of this particular defect. He stated that he did not know this was the same car which had been carried to Myrtis on the day before and whose doors had opened while in transit. He had not examined the car, and thought nothing about its condition upon that occasion. The further question then arises, Was it his duty to ascertain the condition of this car, before making the switch, for the purpose of incorporating it into his train? The rules of the railway company required that, "where there are no car inspectors, conductors must, with the assistance of the trainmen, thoroughly inspect all cars offered and be sure of their safe condition before taking them. They must see that said doors of empty cars are closed and securely fastened." It may be that, when first seen at Myrtis, these doors were fastened with the only devices which had been supplied for that purpose, and that an inspection by the trainmen would have disclosed that fact. The testimony of John Bress tended to show that such fastening was insufficient to withstand the jars and jolts of the train when in motion; and the circumstances detailed by other witnesses rather support that conclusion. Apparently the doors of this car were closed when it was first connected with the engine at Myrtis. Witnesses who testified upon the subject say that, when they saw the car, they did not observe the door being open. The inference from the testimony is that the doors were closed when the engine was attached to the car, but opened, as stated by Bress, just before Carter was struck. The jury might have so concluded.

[5] The rule requiring conductors, with the assistance of the trainmen, to inspect the cars would have been fully complied with had the conductor, or any one of the trainmen, performed this service. It may reasonably be inferred that the inspection imposed by these rules was intended mainly for the benefit of the company in the promotion of its service, and not specially for the protection of the employés against defects. But, assuming that they were for both purposes, let us suppose that the conductor, or · some one of the trainmen, had made the required inspection of this car door, discovered its condition and the defect in the fastening, and had failed to remedy it or to give notice of the defective condition to Carter, could it still be said that Carter had assumed the risk of injury from this source because of the requirement of the rules? Here there would have been a literal compliance with the rules, and Carter still ignorant of his master's dereliction. Section 1 of the federal Employer's Liability Act of 1908 (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) contains this provision: "Every common carrier * * * while engaging in commerce between any of the several states or territories, or between any of the states and territories, * * * shall be liable in damages to any person suffering injury while he is employed by such common carrier in such commerce * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment." It will be observed that this statute abolishes the common-law fellow-servant doctrine. Carter did not, therefore,

assume any risk resulting from the failure of another member of his train crew to do his duty in that particular.

[6] In order to sustain appellee's contention that Carter assumed the risk in this instance because of the rules making it his duty to inspect the car and securely fasten the doors, it must appear that it was Carter's personal and absolute duty to make that inspection for himself. Whether or not the employé assumes the risk of a given situation, which results in his injury, is generally a question of fact to be determined by the jury; and the court is not authorized to refuse to submit the issue, unless the evidence is of such a character that ordinary minds would not differ as to the proper conclusion to be reached. St. L. S. W. Ry. Co. v. Shipp, 48 Tex. Civ. App. 565, 109 S. W. 286; Railway Co. v. Adams, 94 Tex. 106, 58 S. W. 831; S. A. & A. P. Ry. Co. v. Connell, 27 Tex. Civ. App. 533, 66 S. W. 246; Karns v. Railway Co., 87 Kan. 154, 123 Pac. 759. The above authorities also hold that whether or not the employé is guilty of contributory negligence in violating a rule of his employer is a question of fact generally to be determined by the jury.

[7] But conceding that it was Carter's personal duty to inspect this particular car as a precaution for his own safety, did his failure constitute contributory negligence, or did it produce a situation in which he assumed the risk of injury? If he was merely guilty of contributory negligence, he would still be entitled to some recovery under the law governing suits of this character; but, if the risk was one which under the rules of the common law he assumed, he would not. The peremptory instruction given by the court necessarily implied that the court held, as a matter of law, that the risk was one assumed by Carter, if that defense was considered at all.

[8] The defenses of assumed risk and contributory negligence have frequently been referred to and discussed by courts without making any discrimination between them. This is doubtless due to the fact that both have heretofore been treated in law as complete defenses in suits for personal injuries, and there was no necessity for observing the technical legal distinction. But, since the enactment of the statutes recognizing the doctrine of comparative negligence, that discrimination sometimes becomes important. The doctrine of assumed risk, as known at common law, is predicated upon an agreement, express or implied, by which the employé voluntarily exposes himself to the hazards which he encounters in the performance of his duties. The perils which he assumes are those ordinarily incident to his employment, and such as are normally to be expected from the particular character of the service in which the employé is engaged. The rule also includes those dangers arising from the failure of the employer to perform his duty in providing safe tools and appliances and safe places for work, of which the employé knows, or by the exercise of ordinary circumspection in the performance of his labors would know. Assumed risk is founded upon the knowledge of the employé, either actual or constructive, of the hazards to be encountered, and his consent to take the chance of injury therefrom. Contributory negligence implies misconduct, the doing of an imprudent act by the injured party, or his dereliction in failing to take a proper precaution for his personal safety. The doctrine of assumed risk is founded upon contract, while contributory negligence is solely a matter of conduct. 1 Labatt on Mas. & Serv. §§ 305, 306, and notes. If the defect in the fastenings on the car door in this instance is to be attributed to the negligence of the railway company, Carter did not assume the risk of injury from that source, unless he knew of its existence, or by the exercise of ordinary circumspection would have known it. Carter's failure to inspect the car, in accordance with the rule of the company, before attempting to make this switch was a matter of conduct, and at most could only be termed contributory negligence. 1 Labatt on Mas. & Serv. § 419, and notes.

[9] It may or may not be construed as a violation of the rules, for these designated no particular time when the inspection should be made; and the employés upon this occasion might have concluded that, as the doors were closed when the car was coupled to the engine, a further and more minute inspection could as easily be made after the car had been switched as before. But even the violation of a rule of the company could not, under all circumstances, be considered culpable conduct. Whether or not it was must depend upon the particular circumstances of the case. Railway Co. v. Brown, 95 Tex. 2, 63 S. W. 305; I. & G. N. Ry. Co. v. Kindred, 57 Tex. 491; Karns v. Railway Co., supra. In the first case cited above, Justice Gaines used this language: "It may be that the general rules of a railroad company for the conduct of its employés are not absolute. Circumstances creating an emergency may exist, which may excuse the servant for disregard of a rule. Hence the case would have to be clear in which the court should hold that the disobedience of a mere rule is negligence per se."

[10] Counsel for appellee contends that Carter was attempting to perform his duties in a manner prohibited by the rules of the company in making a flying switch; that he thus chose an unsafe method for doing his work; and for that reason he assumed all the risks incident thereto. The rules offered in evidence permit the making of a flying switch when necessary. The determination of when it becomes necessary must, in the nature of things, be left largely to the judg-

ment of the employés. But, if it should be said in this instance that incorporating the car into the train by means of a flying switch was not necessary, there is still another complete answer to appellee's contention. The injury sustained by Carter was not necessarily a result of making a flying switch. He was struck by an open door; and this might have occurred had the switching been done in the usual manner. The car was at the time rolling slowing down the track, no faster, probably, than it would have traveled had it been shoved by the engine in the ordinary way. L. & N. Ry. Co. v. Pearson, 97 Ala. 211, 12 South. 176. The fact that Carter was injured while making a running switch in violation of the rules would be no defense unless it be shown that that method of doing the work proximately caused his injury. In this instance the court could not assume, as a matter of law, that it did.

[11] Appellant also complains of the refusal of the court to place under the rule certain physicians who were present and testified upon the trial as to the existence and extent of the appellant's injuries. The court qualified the bill of exception with the explanation that all of those physicians were experts, and none of them testified concerning the facts, and that he wanted them to hear a complete history of the case so that they could better testify as experts. Inasmuch as it is not insisted that the peremptory instruction in this case was prompted by any lack of evidence concerning the existence and extent of Carter's injuries, it appears that whatever error was committed in the particular complained of was harmless in so far as it related to the disposition made of this case.

[12] The propriety of placing any class of witnesses under the rule during the trial of causes is a matter which rests largely in the discretion of the trial judge, and his ruling in that respect will not be revised, except when it is made to appear that he has abused his discretion. It may be that upon another trial that question will not arise; it is not necessarily involved in the disposition of this suit.

For the errors discussed, the judgment is reversed, and the cause remanded.