### CHICAGO, R. I. & P. RY. CO. v. KING, Adm'x.

No. 20331. Nov. 22, 1932.

Rehearing Denied Oct. 3, 1933.

W. R. Bleakmore, John Barry, W. L. Farmer, Robert E. Lee, and Barefoot & Carmichael, for plaintiff in error.

Bailey & Hammerly and Ben Goff, for defendant in error.

McNEILL, J. This is an action to recover damages for wrongful death under the Federal Employers' Liability Act. George L. King, an employee of the Chicago, Rock Island & Pacific Railway Company, while in the performance of his duties, fell from the top of an oil tank tender of an engine, which resulted in his instantaneous death. The action was instituted in the district court of Grady county on December 19, 1927, by Claudia King, surviving wife and widow of said decedent, as the administratrix of the estate of said decedent, against said railway company.

It appears that said decedent was a man of about 45 or 50 years of age, and had worked for said company for approximately eight years, during which time he was engaged primarily as a fireman, but at the time of his death he was working as a hostler in the town of Chickasha. His duties required him to take charge of the engines when they came in from a run and to put them in the roundhouse to have them properly oiled, refueled, and reconditioned for another run. In the early morning, about 3 a. m., of February 1, 1927, while engaged in refueling an engine for said company in the performance of his duties as a hostler in the railroad yards of said company, he took engine No. 878, which was pulling an interstate passenger train operating between Dallas, Tex., and Minneapolis, Minn., and proceeded to refuel it for the purpose of its outgoing run. This engine had previously been a coal burning engine and had been converted into an oil burning engine. In the tender, which had been previously equipped for carrying coal, there had been constructed a tank for fuel oil for the operation and movement of said engine. Plaintiff, in part, alleges in her petition, as follows:

"* * * Plaintiff further shows that in preparing and changing said tender from a container of coal to a container of oil, the defendant company, * * * so constructed said oil tank as to elevate the top of the oil tank or receptacle 28 to 30 inches above the top of said tender, the front of said oil tank being approximately 18 inches be-

hind front of tender, and carelessly and negligently so constructed said oil tank as to leave an opening of 15 inches between the inside wall of said tender and the outside wall of said oil tank; and * * * negligently and carelessly left protruding upward and across the space on top of tender a rough, irregular sheet of steel, which said sheet of steel was of approximately one-fourth of an inch of thickness, and which said piece of steel so protruding was of the approximate height of 15 inches.

"Fifth: Plaintiff further shows that * * * there was left a space of from 28 to 30 inches, which it was necessary to execute at a single step, and that by reason of the failure * * * to cover said space between the outside wall of said oil tank and the inside wall of said tender, it became necessary to pass over such opening and over said rough, uneven and protruding sheet of steel, and required one passing from the top of said tank to the cab of the locomotive engine, to step down a distance of from 28 to 30 inches, and over and across said protruding sheet of steel and said uncovered opening between the inside wall of tender and the outside wall of said tank instead of the usual and customary distance of 14 to 15 inches over cover space and remove steel sheet.

"Sixth: Plaintiff further shows that on the night of the 1st day of February, 1927, while engaged in the performance of his duties and acting under the authority and direction of defendant's superior officers and employees, that it became necessary to refuel with oil the aforesaid locomotive engine and tender of said defendant company; that said deceased, in the usual and customary manner, placed said engine at a point for receiving oil and fuel, and went upon the top of said oil tank, as it was necessary that he do, for the purpose of filling and refueling the same, for its future use and service in interstate commerce; and that in the course of his duties, and acting with due and ordinary caution, it was then necessary for him to dismount from said oil tank to the engine cab, for the purpose of removing such engine to the defendant's roundhouse; and plaintiff alleges that in dismounting from the top of said oil tank, in an effort to return to said engine cab, that said deceased, acting with due caution and in the usual and customary manner, undertook to step from the top of said oil tank to the top of the wall of said tender, as was necessary that he should do, but that by reason of the faulty construction of said oil tank and by reason of the neglect and failure of the defendant company * * * to cover said opening, it became necessary and said deceased was required, acting with due caution, to step or attempt to step from the top of said oil tank to the top of said tender, as negligently constructed, a dis-

tance of 28 to 30 inches, and over and across said protruding sheet of steel so negligently and carelessly left and retained by the defendant's servants and employees; and plaintiff says that in so returning to said cab from the top of said oil tank, and acting with due caution, that by reason of the careless construction of said oil tank and said tender, and wholly within the course of his duties and under the directions of the defendant company and its employees, said deceased was caused to stumble, and was thrown and fell from said tender to the ground, a distance of approximately 12 feet, and was injured and killed.

"Seventh: Plaintiff further shows that said injury and death of said deceased was wholly caused by reason of the wrongful acts and negligence of his defendant company, its agents and employees, in constructing said converted tender as hereinabove alleged, and in failing and refusing to provide a reasonably safe place in which said deceased was to work, and in failing to use reasonable and ordinary care in changing and converting said tender from a carrier of coal to a carrier of fuel oil, and that said death of the said George L. King was without default or want of care on the part of said decedent, but that said decedent was, at all times, acting with due and ordinary care. * * *"

The defendant admitted that the coal tender had been converted to an oil burner, and that the oil tank was about five feet high with a large flat surface built in the shape of the tender setting in the oil tender, but asserts that this tender was equipped with all the safety devices prescribed by the Interstate Commerce Commission; that it had steel steps at the front and also at the rear end for its ascent and descent; that it had a rail on the top for the use of persons working around on the top of the tank; that the deceased did not fall from the top of the tank at either place provided for descending therefrom; that decedent fell from the right front corner of the tank while the engine and tender were standing still and facing the north; that this was not the place provided for his descent and he was at a place strictly of his own choice.

Defendant alleged in its answer, in part, as follows:

"Answering further and for a separate defense, this defendant alleges and states that the plaintiff's decedent, George L. King, was, at and prior to the alleged injury complained of in plaintiff's petition, a skilled and experienced workman and employee, fully versed, trained and skilled in the performance of the duties and work he was at that time engaged in performing and doing, and that the plaintiff's decedent did

well, truly and intimately know each, every and all of the conditions surrounding or bearing upon the work he was engaged in doing at the time of the alleged injury complained of in plaintiff's petition, knew intimately and well the construction of the coal carrying tender described in plaintiff's petition, which had been equipped so as to carry oil; knew well and intimately the nature and character of its construction and had worked on and with said tender at numerous times prior to the time of the alleged injury. That if the said plaintiff's decedent was injured that such injury was due to and proximately caused by the ordinary and natural risks, dangers and hazards incident to performing the work and duties plaintiff's decedent was engaged in performing and doing, and that the plaintiff's decedent well knew, understood and appreciated the risks, dangers and hazards, incident thereto, and did assume such risks, dangers and hazards. That if any part of the said coal tender or oil container on said tender was improperly constructed, which this defendant expressly denies, that the said plaintiff's decedent was intimately acquainted with and knew of such construction, and knew of every risk, danger, and hazard incident to working on said coal or oil fuel tender, and if plaintiff's decedent was injured thereby, which is expressly denied by this defendant, that the said plaintiff's decedent appreciated, knew and understood and assumed the risks, dangers and hazards incident thereto. Answering further and for a separate defense, this defendant alleges and states that if plaintiff's decedent was injured at the time and place complained of in plaintiff's petition, that said injury was due to and proximately caused by the carelessness and negligence of plaintiff's decedent, which carelessness and negligence on the part of plaintiff's decedent consisted in plaintiff's decedent's failure to use and exercise ordinary care, prudence and caution in doing and performing the work he was engaged in doing and performing at the time of the alleged injury; in carelessly and negligently failing to observe the condition of the floor or top of the tender tank, the position of the cab of the engine to which the tender was attached; in failing to observe the nature, size and character of the steps to and onto which the plaintiff's decedent should step in returning from the floor or top of said tender; in carelessly and negligently failing to guard and protect himself from slipping, tripping, stumbling or falling; and that all of said acts of carelessness and negligence on the part of plaintiff's decedent contributed to, concurred in and approximately caused any injury the plaintiff's decedent may have suffered or sustained. * * *"

The case was tried before a court and jury and the jury by unanimous verdict awarded plaintiff damages in the sum of $10,000. Counsel for defendant on appeal have grouped their assignments of error under the following propositions:

"1. The evidence shows no causal connection between the alleged negligence of defendant and the injury of deceased. Defendant's demurrer to the evidence should have been sustained. Failing in that the trial court should have instructed the jury to return a verdict for the defendant.

"2. The oil tank from which defendant fell was equipped with safety steps for descent from the top thereof. These steps were those prescribed by the Interstate Commerce Commission for general use by railroads. Defendant therefore owed no further duty to deceased in equipping said tank with steps or other methods for descending from the top thereof.

"3. The undisputed evidence shows that deceased was furnished with a safe way to descend from the oil tank. If he chose an unsafe way he did so at his peril and assumed the risk.

"4. The verdict of the jury wholly disregarded the court's instruction. Failure of court to grant defendant a new trial on account thereof constitutes reversible error."

The only person who witnessed this unfortunate accident was a faithful colored employee of said railway company, James Snead, the helper of decedent, who had been working in the yards of said company assisting in handling its engines for 18 years continuously. Both sides recognized the importance of the testimony of this witness, and he was thoroughly examined as to the general detailed construction of the tender and its fuel tank, its height, and relative distance of its various parts in reference to the tender and the engine cab, and the locations, character, and nature of the rough piece of iron which plaintiff contends was negligently left in such condition as to trip the decedent as he was stepping down from the fuel oil tank to take his place in the engine cab. This witness testified that they had filled the tank with oil and that their next duty was to back the engine to the coal chute and take sand; that it was the duty of Mr. King, the decedent, to back the train up to the coal chute to get this sand: that to do so, it was necessary for him to go into the engine cab to get hold of the lever and throttle. He described the facts surrounding the accident, in part, as follows:

"Q. Now, you say now there was about twelve inches opening in between the water

tank and the piece of steel that was cut off? A. Yes, sir. Q. Did you say whether or not you saw Mr. King take hold of the cab? * * * A. No, sir; he was reaching for the cab. * * * Q. It seems that he missed it with his hands, you say? A. Yes, sir. * * * Q. Now, where did you find Mr. King, after you got around there where he was? A. Lying with his shoulder up against the step here, this step, and his feet were south, in here. Q. How close was he up to the track there, or to the wheels of the tender? A. Why, he was right up against the step. Q. He was right up against the step? A. Yes, sir. Q. And the steps are right at the north end of the tender? A. Yes, sir; north of the tender, yes, sir. * * * Q. Now, after Mr. King started north * * * the northeast corner of the tender; just explain now what happened and what Mr. King did at that time? * * * A. When Mr. King walked to the northeast corner of the cab, when he was stepping down, his right foot * * * A. He stepped down, down off of the oil tank to this rough edge there, somewhere down there. * * * Q. How deep did you say that step would be? A. About 18 inches from the top down to the level. Q. That is, level with the top of this piece of steel? A. Level with the piece of steel, the top of the steel from the top of the oil tank; not so far as the bottom. Q. It would be 28 down to the landing? A. Yes, sir. Q. Twenty-eight inches? A. Yes, sir. Q. Well, he made this step and then what happened? A. His foot seemed to have went west, like he was tripping, some way another. * * * Q. Which way did his foot slip, if you know? A. His foot slipped to the west; that throws him to the right, to the ground. Q. Was his foot—could you see his foot at that time, or approximately where it was? A. No, where I was standing I could not see clean to his foot. Q. Where his foot hit? A. No, sir. Q. And his body fell to the east, did it? A. Yes, sir. Q. He fell off of the tender? A. Yes, sir. Q. Did you assist him immediately; go to him immediately, Jim? A. Yes, sir; I got to him as quick as I could. Q. How long did he live after fell? A. Well, he seemed to be instantly dead when I got around to him. * * * Q. Well, this hole that was there, was that left open or was it filled any way? * * *"

In reference to the space between the top of the cab and the front end of the oil tank and the accessibility to the ladder between the tender and the engine, the witness testified, in part, as follows:

"Q. Now, those three regulators there— I will call them that— A. Yes. Q. Are right over these steps that you mentioned, aren't they? A. Yes, sir. Q. There is a pipe of some sort comes out of the top of the tank and runs around there which I assume is an oil feed pipe, is it not? A. Yes, sir. Q. And that comes right down between the two regulators? A. Yes, sir; that is called the heater pipe. Q. Well, it is a pipe anyhow, covered with asbestos, or something, and so those things would be right in the path of one approaching these steps wouldn't they? (No audible answer.) Q. Now you said this morning, as I recall, it was 2½ or 3 feet from the top of the oil tank to the top of the cab there, is it not? A. Yes, sir. Q. Now these things, these regulators, are up in that cab, aren't they, the cab comes over them? A. Yes, sir. Q. So you would only have the distance between them of 15 or 20 inches from the top of these regulators up to the bottom of your cab? A. Top— Q. There, wouldn't you? A. Yes, sir. Q. What sized man was Mr. King, as you remember him, Jim; what would he weigh? A. Well about a hundred and maybe seventy-five or eighty pounds."

On cross-examination he testified, in part, as follows:

"Q. But he did not get hold of the cab; did you see his hands out like this (indicating)? A. I seen his hands out; as he reached out, he fell over. Q. You don't know; you just saw him fall off? A. Yes, sir. Q. You don't know whether he stepped on this cut off piece of steel or not, do you, Jim? A. No, sir; I don't know what he stepped on; I didn't see his foot; I couldn't see his foot; I just seen him stepping off. Q. You just saw him go off; did his heels go up? A. Yes, as he went over, he went over on the ground, his heels come up. * * * Q. You didn't see him trip on anything, did you? A. No, sir. * * * Q. His feet then, at the time you saw them, were a foot or more above this cut off piece of steel, were they not? A. Yes, sir. Q. And it was impossible for you to tell whether or not his foot ever touched that cut off piece of steel or not, wasn't it? A. Yes, sir."

Counsel for defendant state in their reply brief as follows:

"No witness testified that the exposed ledge, caused by cutting the side of the coal tender, either caused the decedent to stumble, trip, or that his foot ever touched such exposed ledge.

"We quoted the entire testimony of witness Snead, the negro helper. His testimony in chief, standing alone, might be strong enough to infer that the decedent stepped down upon this exposed ledge; his cross-examination clearly shows that he was in no position to see, and did not see, and, in fact, the actions of the decedent in dismounting from the tender show the decedent permitted his body to fall forward for the purpose of catching the top of the cab

with his hands and swinging down into the deck of the engine."

In this case both sides requested the court and jury to view the engine and the tender. This was done. The jury had a right to weigh the information obtained by such view in connection with all the facts and circumstances developed by the evidence in the trial of the case. Chicago, K. & W. T. Co. v. Willets (Kan.) 25 P. 576; City of Topeka v. Martineau, 42 Kan. 387, 22 P. 419. The jury had before it the testimony of the witness Snead as to the construction of the tender with its exposed rough edge, its relative position from the cab, and the distance and space from the top of the oil tank to the center and outside edge of the overhanging portion of the engine cab, the position of the deceased as he was falling, his position after he did fall relative to the track, tender, and cab, the testimony relative to the torn off heel showing the portion of the sole of the shoe underneath to be clean and smooth, free from dirt, oil and gravel, and it was for the jury to determine from the facts and surrounding circumstances whether or not the defendant negligently left exposed the rough iron ledge so as to cause the decedent to stumble or trip, which resulted in the fall which caused his death.

In the case of Myers v. Pittsburgh Coal Co., 233 U. S. 184, 34 Sup. Ct. 559, the Supreme Court of the United States, in speaking of a verdict in favor of the plaintiff in an action for wrongful death, said:

"A verdict in favor of plaintiff in an action for death should not be set aside by an appellate court for the lack of evidence to support it unless the testimony was such that no recovery could be had upon the facts shown in any view which can properly be taken of them."

Much stress is urged on behalf of the defendant railway company that the decedent assumed all risk. It is settled law that it is the duty of the master to use reasonable diligence in providing the employee a safe place to work. Myers v. Pittsburgh Coal Co., supra. This is a continuing and nondelegable duty. In many cases it is difficult to clearly distinguish whether the circumstances and facts in a given case come within the defense of assumption of risk or contributory negligence when such affirmative defenses are pleaded. Sometimes the defense of assumption of risk seems to pass, merge, or shade into the question of contributory negligence. However, there is a basic and very positive and distinct difference between these defenses. The assumption of risk is based upon knowledge and decision, which includes an intelligent choice and is contractual in its nature. The defense of contributory negligence has its foundation in tort. Both being affirmative defenses, the burden of their proof is imposed upon the defendant.

In Roberts' Federal Liabilities of Carriers (2d Ed.) sec. 831, it is said:

"An employee has the right to assume that his employer has exercised due care for his safety. He is not to be treated as assuming the extraordinary risks arising from the defects due to the negligence of the employer unless he has knowledge of them and the danger arising therefrom, or unless the risk and danger are so obvious that an ordinarily prudent person under similar circumstances would have known the risk and appreciated the danger arising therefrom."

In support of this rule many cases are cited in the foot-note.

In section 836, supra:

"The distinction between assumption of risk and contributory negligence under the federal act is important for the reason that, except as to violations of federal statutes for the protection of employees, assumption of risk is an absolute defense and contributory negligence only reduces the damages. As construed by the United States Supreme Court an employee assumes the ordinary risks and hazards of his occupation and also those defects and risks which are known to him, or are plainly observable, although due to the master's negligence. Contributory negligence, on the other hand, is the omission of the employee to use those precautions for his own safety which ordinary prudence requires." Citing Schlemmer v. Buffalo, R. & P. R. Co., 220 U. S. 590, 55 L. Ed. 596, 31 Sup. Ct. 561.

In section 841, supra:

"Knowledge of the risk is the watchword of the defense of assumption of risk. Want of due care in view thereof is that of contributory negligence."

The Supreme Court of Utah, in the case of Kuchenmeister v. Los Angeles & S. L. R. Co., 172 P. 725, in an action coming under the Federal Employers' Liability Act, said:

"The defenses of assumed risk and contributory negligence are entirely independent, and in case there is a conflict in the evidence, or where the facts are such that reasonable men may legitimately draw different conclusions from the evidence, or may arrive at different conclusions, it cannot be

determined as a matter of law that either the one or the other defense is established, and the jury may, therefore, find that one of the defenses was established and may also find that the other was not. While in some of the cases there is some confusion respecting the distinction between the two defenses, yet, as a general rule, the courts have found little difficulty in enforcing the true distinction. The distinction is, perhaps, as well and as clearly stated in a few words as that can be done in the case of Thomas v. Quartermaine, in L. R. 18, Q. B. Div. at page 697, where, in discussing the distinction, it is said:

" 'But the doctrine of volenti non fit injuria (assumed risk) stands outside the defense of contributory negligence and is in no way limited by it. In individual instances the two ideas sometimes seem to cover the same ground, but carelessness is not the same thing as intelligent choice.' * * *

"The distinction is also very intelligently discussed and clearly stated by the author in 3 Labatt, Mast. & Serv. sec. 1219 et seq. The fundamental element in assumption of risk, where it is not assumed as a matter of contract, as stated in the foregoing quotation, is 'intelligent choice'; that is, the employee, before he may be charged with having assumed the risk, must not only have fully understood and appreciated the danger, but he, in the very face of the danger, must, voluntarily, have assumed the risk of injury. Nothing short of that constitutes 'intelligent choice.' "

In the case of Northwestern Pac. Ry. Co. v. Fiedler, 52 Fed. (2d) 400, which quotes from the Supreme Court of the United States relative to negligence and assumption of risk, the court said:

"The general rule as to negligence is that it does not present questions of law, which justify the direction of a verdict, except where all reasonable men must draw the same conclusions from the evidence. New York, N. H. & H. R. Co. v. Pascucci (C. C. A. 1) 46 F. (2d) 969, 972, citing Chicago, St. P. M. & O. Ry. Co. v. Nelson (C. C. A.) 226 F. 708, 711.

"As to assumption of risk, the Supreme Court has laid down the following rule; 'The burden of proof of the assumption of risk was upon defendant, and unless the evidence tending to show it was clear and from unimpeached witnesses, and free from contradiction, the trial court could not be charged with error in refusing to take the question from the jury.' Kanawha & Michigan Railway Company v. Kerse, etc., 239 U. S. 576, 581. 36 S. Ct. 174, 175, 60 L. Ed. 448."

In the case of Chicago & E. R. Co. v. Ponn, 191 Fed. 682, 687, 688, 112 C. C. A. 228, it is said:

"Assumption of risk" and "contributory negligence" are entirely distinct. One has to do with contract and the other rests in tort. "Assumption of risk" is the voluntary contract of an ordinarily prudent servant to take the chances of the known or obvious dangers of his employment and to relieve his master of liability therefor, while "contributory negligence" is the casual action or omission of the servant without ordinary care of the consequences, or the omission "to use those precautions * * * which ordinnary prudence requires."

Also, in the case of Davis, Agent & Director of General Railroads, v. Scroggins, 284 Fed. 760, it was said:

"Refused charges numbered 3 and 4 each involved the assumption that, though the defendant was negligent in permitting the hole to remain in the platform, the plaintiff assumed the risk of injury by stepping in it if, by exercising ordinary care for his own safety, he would have learned of the danger therefrom. That amounted to saying that the plaintiff was under a duty to exercise care to discover the danger. The charges exacted more of the plaintiff than the law requires. The employee is not obliged to exercise care to discover dangers not ordinarily incident to the employment, but which result from the employer's negligence. While an employee assumes the risks and dangers ordinarily incident to the employment in which he voluntarily engages, so far as these are not attributable to the negligence of the employer, or of those for whose conduct the employer is responsible the employee has a right to assume that the employer has exercised proper care with respect to providing a reasonably safe place of work, and is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it. Chesapeake & Ohio Ry. Co. v. Proffitt, 241 U. S. 462, 36 Sup. Ct. 620, 60 L. Ed. 1102; Choctaw, Okla. & G. R. Co. v. McDade, 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96; Republic Elevator Co. v. Lund, 196 Fed. 745, 116 C. C. A. 373, 45 L. R. A. (N. S.) 707; United States Smelting Co. v. Parry, 166 Fed. 904, 92 C. C. A. 159."

From this record it appears that this is not a case which involves the assumption of risk; that the acts of the decedent and the facts and circumstances surrounding his death partake more clearly of negligence on the part of deceased rather than assumption of risk. The facts surrounding the circumstances in this case in our opinion present the question of the negligence of the deceased as it pertains to his conduct, for his own safety, the omission and failure,

if any, to do that which an ordinarily prudent employee would have done under the same or similar circumstances. The fact that the railroad company provided and complied with all the requirements of the Interstate Commerce Commission does not relieve it in all cases of its duty to employees in considering the question of its primary negligence in case of injury to its employees. Such requirements may or may not amount to a minimum duty performed on behalf of the safety of its employees.

Counsel for plaintiff state in their brief that the trial court burdened the plaintiff with the assumption of risk, hazards, and dangers as were ordinarily incident to the employment of decedent as well as the hazards, risks, and dangers as were known to him or must necessarily have been known, and urge that the assumption of risk was not substantiated from the facts and circumstances in the case. We think there is justification in this contention. However, the jury resolved this question of assumption of risk in favor of the plaintiff. And even though the facts and circumstances in this case involve the question of assumption of risk, the question of fact, as to whether the decedent knew and appreciated the danger of descending over the rough piece of steel on this particular tender at the place he selected to descend to the cab of the engine, was clearly for the determination of the jury. The determination of those facts when applied to the decedent working on this oil tank in the nighttime was not a question of law for the court. From this record there is no evidence that decedent ever knew of or saw this rough piece of steel, or that it had ever been called to his attention. There is no evidence that he had ever attempted, prior to the time of the accident, to descend to the cab from this corner of the tender. So far as this record is concerned, he may have always ascended and descended from the opposite end of the tender. The record is silent as to whether his duties required him to recondition with oil another tender similarly constructed. So far as this record shows, decedent had a right to assume that his master had exercised the standard of due care, which required the reasonable care and diligence on the part of the master to provide him with a safe place to work under the circumstances, daytime or nighttime, as the case might be, and as said in the case of Davis, Agent and Director of General Railroads, supra, such employee "is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it."

Under this evidence it may be assumed that the deceased attempted to descend directly to the cab from the oil tank. In doing so, it is not shown that he disobeyed any rule of the railway company or that his course of conduct in descending might not have been adopted under similar circumstances by a careful, reasonable, and prudent employee. See Brady v. Florence & C. C. R. Co. (Colo.) 98 P. 321, also Duvall v. Brooklyn Cooperage Co. (Mo. App.) 275 S. W. 586. The decedent was not required to keep his mind constantly on the ragged piece of steel, even though he may have known of same, in the performance of his duties. His standard of care was that of the ordinarily prudent person. It may be that, in a moment of forgetfulness, he proceeded to step down on the rough piece of steel thinking that the tender was the usual and customary tender, equipped as the other tenders on which he had worked. To require this constant attention would be a greater burden upon deceased than is required by law. See Kelly v. Perrault (Idaho) 48 P. 45. It was not his duty to inspect, alter, or repair the engine and tender. If he used the ladder between the tender and the cab, it seems that he was required to turn in his descent, or "craw fish" backward over the grabhold under the overhanging top of the cab, stepping over the open space between the outer wall of the oil tank and the inner wall of the tender, which under this evidence may or may not have been more or less crowded for a man of 175 to 180 pounds, and said decedent, realizing this situation, may have had good reason to proceed to descend from the corner which he selected, feeling confident that in doing so he was exercising proper care with respect to his own safety. In the face of such danger, as it proved to be, can it be said as a matter of law that he fully understood, appreciated, and knew that he was at the moment making a step of about 28 or 30 inches to a rough piece of steel which at that particular hour of day may or may not have been more or less dimly lighted, and that in doing so, he exercised an intelligent choice? It must be remembered that before he can be charged with voluntarily assuming a risk he must have had knowledge of the circumstances, and fully understood and appreciated the

danger. Kuchenmeister v. Los Angeles & S. L. R. Co. (Utah)-172 P. 725, supra.

Counsel for defendant urge that the deceased was furnished with a safe way to descend from the oil tank, and that if he chose an unsafe way, he did so at his peril and assumed the risk, and the master is not liable. Whether one place is safe and the other unsafe is to be viewed from the facts and surrounding circumstances. Where reasonable men may differ, it is a question for the jury.

The Court of Civil Appeals of Texas in the case of Southern Pac. Co. v. De La Cruz, 201 S. W. 428, which was a suit for damages under the Federal Employers' Act, in the second paragraph of its syllabus said:

"The issue raised by evidence of an employee choosing an unsafe way of doing work, when a safe, suitable, and convenient way is available, is only that of contributory negligence, and not of assumption of risk."

In the body of the opinion, the court said:

"The citations given show that our courts sometimes have simply employed the phrase 'assumed the risk' to express the conception of contributory negligence. The courts of many other states have done likewise; but as is pointed out in 3 Labatt's M. & S. (2d Ed.) secs. 1219 to 1225, it is merely a matter of incorrect terminology. See, also, 2 Bailey on Personal Injuries (2d Ed.) secs. 354, 357, 366, 443, 459, 461, 469. Assumed risk and contributory negligence are distinct defenses, the doctrine of the former being founded upon contract, the latter being solely a matter of conduct. While these defenses have frequently been referred to and discussed without making any discrimination between them, since the enactment of the state and federal comparative negligence statutes, such discrimination frequently becomes very necessary. Carter v. Railway Co. (Tex. Civ. App.) 155 S. W. 643. In the case at bar, if plaintiff voluntarily chose the dangerous way of placing the iron upon the vase of the hammer with his hands instead of using tongs or pickups, then he was simply guilty of imprudent conduct, which constituted contributory negligence rather than an assumption of the risk."

In the case of Erie Ry. Co. v. Purucker, Adm'rs, 244 U. S. 320, the Supreme Court of the United States said:

"The trial court properly refused a requested instruction, in an action against an interstate railway carrier to recover for the death of a section man who was run over by an engine on his way to report for work, that if, in the getting off from the track on which he saw a train approaching, he could, with safety and reasonable convenience, have stepped away from the tracks, and by his own choice stepped on a parallel track and was struck by a train on that track, he assumed the risk of such choice. Such request did not cover the elements of assumed risk, and was more properly applicable to the defense of contributory negligence."

Roberts on Federal Liabilities of Carriers (2d Ed.) 835, section 568, even in reference to positive violation of rules, says:

"In an action under the federal act, the defendant pleaded in its answer that the plaintiff had contributed to his own injury by violating one of its rules governing employees, and that he therefore assumed the risk. The court held that such a fact, even if proven, did not show assumption of risk for the reason that such a defense is referable to contributory negligence and not to assumption of risk."

There is no evidence that decedent realized he was on this particular engine No. 878 and tender. The jury visualized the testimony and made its application as to the tender, oil tank. cab, oil feed pipes, grabhook, and the difficulty, if any, in descending on the ladder between the cab and tender on account of its crowded condition due to the irons. pipes, grabhook and overhanging top of the cab and the size of the open space between the top of the oil tank to the tender. It was the unanimous verdict of the jury, approved by an able and experienced trial court. who also viewed the engine, tender, and cab that there was no assumption of risk on the part of deceased in descending to the cab. In choosing the place which decedent attempted to descend may have been the act of an ordinarily prudent person, or, on the other hand, it may have been imprudent conduct on the part of decedent. In any event it was a matter for the jury to determine.

The defendant also pleaded contributory negligence. This action is controlled by the Federal Employers' Liability Act, and even if the decedent was guilty of contributory negligence, which the jury may or may not have found in rendering its verdict. it would not relieve the defendant from liability, as such negligence only operated to reduce the amount of the verdict. The jury was properly instructed upon this question.

Counsel for defendant assert that the court should have sustained the demurrer of the defendant to the evidence of the plaintiff or directed a verdict in its favor. We think this contention is unsound. From a

review of this record, it would be difficult to conceive how the trial court could have found that the evidence was so conclusive that it would have been compelled in the exercise of its sound judicial discretion to have directed the verdict or to have set aside the verdict in this case. If it was not of such a conclusive nature, it was the court's duty to present the issues to the jury. See Conrad v. Wheelock, 24 Fed. (2d) 996. It is our opinion that no prejudicial error resulted in submitting the issues to the jury. Wichita Falls & N. W. Ry. Co. v. Davern, 74 Okla. 151, 177 P. 909. Defendant failed to establish its affirmative defense of assumption of risk The case was based upon a causal connection between the alleged negligence of the defendant and the resulting injury to decedent complained of by plaintiff, and the verdict of the jury was not based upon mere conjecture and speculation.

We have examined the instructions which were given by the court and those which were requested to be given by the defendant. We conclude that defendant cannot complain of prejudicial error in the instructions which were given by the court and the refusal of its requested instructions. The instructions were more favorable to the defendant than the law required.

The judgment of the trial court is affirmed.

LESTER, C. J., CLARK, V. C. J., and CULLISON and ANDREWS, JJ., concur. HEFNER, SWINDALL, and KORNEGAY, JJ., dissent. RILEY, J., absent.

---

HEFNER, J. (dissenting). I dissent for the reason that there is no primary negligence shown. The rough piece of steel mentioned in the majority opinion was about 28 inches below the top of the tender, and at a place where deceased was not supposed to be. There were steps both in front and at the rear for him to use. Instead of using the steps provided for him, he climbed down at or near the corner of the tender and at a place not provided for him by the defendant.

Mr. Justice SWINDALL and Mr. Justice KORNEGAY join me in the dissent.