## KANSAS CITY SOUTHERN R. CO. v. HOYLE.

No. 28520.   Jan. 17, 1939.

Rehearing Denied June 6, 1939.

Joseph R. Brown and James B. McDonough, for plaintiff in error.

M. O. Counts and Guy L. Andrews, for defendant in error.

DANNER, J.   Plaintiff brought this action under the Federal Employers' Liability Act to recover damages for injuries to his health, resulting from a heatstroke sustained March 13, 1937.

In the petition it is alleged that the plaintiff at the time of the injury resided at Heavener, Okla., and was in the employ of the defendant, a railroad corporation operating over lines extending through Missouri, Kansas, Oklahoma, Arkansas, Texas, and Louisiana, with its southern terminus at Port Arthur, Tex. That the defendant maintains a "division point" at Heavener, at which place are located agents and employees of the defendant, also a roundhouse, turning tables, pits, etc., over which locomotives operated by the defendant are placed for the purpose of washing boilers, cleaning fireboxes, and making repairs. That plaintiff was employed by the defendant as a boilermaker in the yards and roundhouse, and was subject to the orders and directions of H. H. Davis, defendant's roundhouse foreman. In the petition it is further alleged:

"That on the 12th day of March, 1937, his shift, or period of work, was what is known as the 'night shift,' that is, he worked from the evening of the 12th of March, 1937, to the morning of the 13th of March, 1937; that between the periods last named, a train of the defendant known as a 'Fast Freight Train' was brought into the yards with the assistance of an engine of what is known as the 'MALLETT' type: that such designed was originally designed for a passenger engine and that said engine was used as a freight engine operating between (among other points) DeQueen, Arkansas and Heavener, Oklahoma; that because of the difficulty in pulling their trains over the mountain grades between the last-named points, two (2) engines were required to get sufficient power to transport the freight and freight trains along these lines of the defendant at the speed provided in their schedule;

"That the trains so operated were what is known as their Trains No. 77 and No. 88; No. 77 being that train hauling freight south between Kansas City and Shreveport, Louisiana; and No. 88 being that train carrying freight north from Shreveport, Louisiana, to Kansas City, Missouri; that the engine referred to used on the North-bound freight was what is known as Engine No. 807;

"That it was a heavy engine, the firebox was lined with fire-brick and it was built of thick and heavy materials and would hold heat, unless cooled down in some manner, for many hours after it was taken off its run; that on said night said Train No. 88 was being pulled in part by Engine No. 807 and arrived at the division point of Heavener behind its schedule for the reason that the boiler tubes had sprung a leak and that it was impossible to produce an adequate and satisfactory head of steam for use in such engine; that it was neces-

sary to repair such engine so that it might be turned around at the town of Heavener and again attached to the Fast Freight going south, carried across the southern line of Oklahoma into the State of Arkansas and among other points to the town of De-Queen in the State of Arkansas.

"When the condition of the engine became known, your plaintiff was commanded by H. H. Davis, hereinbefore mentioned, to speedily repair such engine so that it might next morning be again used to haul the train whose destination was Shreveport, Louisiana: that before the work of repairing the leak in said boiler could be undertaken, it was necessary for certain other work to be done by the machinists employed at said roundhouse and such work was done under the direction of the said H. H. Davis; that the water was taken from such boiler and said machinists completed their work sometime about 1:30 of the morning of March 13th;

"That at or about said time your plaintiff reported to the said H. H. Davis that he believed the said engine was too hot to do and perform the things necessary to be done in order to repair said engine; that in said repair it became necessary for this plaintiff to go into the firebox of said engine and by the means of a torch to cut off the end of a defective flue—a long, tubular piece of metal running from the front of the engine to the firebox with a flange or collar at each end of said flue, such flue being about twenty-one (21) feet long. When your plaintiff had complained to said H. H. Davis about the condition of the engine, he (Davis) went to the place where said engine was standing, turned cold water into it, removed certain plugs from the front of it so that the water could circulate through said engine and escape from orifices left by the plugs, it being the purpose of said Davis to reduce the temperature of said engine.

"Your plaintiff shows that after the water had been allowed to circulate for some time as hereinbefore said, the said Davis advised this plaintiff that the place was safe and instructed him to proceed with such work and your plaintiff herein, in obedience to the orders of his superior, went with a helper into the firebox, as aforesaid, and proceeded to do those things necessary to be done to remove the flue from its position in the boiler of said engine so that the necessary repairs could be made; and

"Your plaintiff shows that he undertook the work because of the assurance of his superior, H. H. Davis, as aforesaid, and relying upon his knowledge and judgment relative to the work to be undertaken.

"Your plaintiff shows that it was the duty of the defendant to exercise reasonable care to furnish him a safe place within which

to work and to provide a safe method within which to do his work; and to that end make such inspection as would reasonably determine the temperature and condition of the firebox.

"Your plaintiff further shows that it was the custom when a boiler maker had to work in a heated firebox, to project near the forward portion of the heated engine a jet of steam that would be forced out through the forepart of said engine; that the effect of such jet of steam being so forced out was to induce and maintain a current of air circulating through said firebox and in and around the place where your plaintiff would work; but upon the occasion now mentioned, your plaintiff shows that the defendant failed and refused to take this precaution, that instead he placed another workman in the front end of such engine so that such workman was engaged in cutting off the flange or collar from the defective flue in that portion of the engine and said jet of steam would have injured said workman so placed at the forepart of said engine.

"Your plaintiff shows that the defendant knew or should have known that the firebox in which he was ordered to work was too hot for him to work in safety and especially so to work without benefit of the current of air, which would have reduced the temperature of said firebox and made his place of work cooler and more nearly safe; and

"Your plaintiff further shows that notwithstanding the assurance of said Davis that the place was safe for him, the firebox was so intensely heated that it affected his lungs, heart and nerves so that he became from such heat violently ill, and after leaving said engine became unconscious at his home in the town of Heavener; that the effect of the heat has been to inflict upon your plaintiff a permanent injury that totally incapacitates him from the performance of his labor; that the nerves in his legs are so that he can scarcely stand or walk upon them; that he has no strength with which to perform any labor, and he is entirely deprived of his means of livelihood; that he has suffered intense pain and mental anguish; that he has been compelled to lie for weeks in his bed and is now confined to his house practically all the time; that

"He has been to the hospitals and been treated by the physicians of the defendant and has been advised by such physicians in charge of defendant's hospitals that there is no hope for recovery for him; that the injuries caused by the excessive heat make it impossible for him to perform any gainful labor or follow any occupation from which he could obtain a livelihood; and

"Your plaintiff says that his injuries were caused by the negligence of the defendant in this: that it through its foreman directed him to work on said engine and in

said firebox when the condition of said engine and condition of said firebox from the heat that had gathered and was retained by the firebox and metal of which the engine was constructed made it unsafe for him so to work and it was negligent in that it failed and refused to operate a steam jet that would have produced for him a current of cooler air that would have reduced the excessive heat and made it possible for him to work there without permanent injury; that it was negligent in that it failed and refused to properly inspect the engine in which he was directed to work, to use reasonable precaution to make such place of work safe for your plaintiff; and that said concurring acts of negligence and each of them severally produced the injuries herein complained of.

"Your plaintiff further says that at that time he was forty-seven years of age, was an efficient workman, was capable of earning and was earning the sum of $200 per month; that he had been injured in the loss of earning capacity in the sum of not less than $25,000; that he has been damaged by reason of the physical pain and mental anguish that he has and will continue to suffer in the sum of not less than $20,000, which damage occurred because of the matters and things herein set forth and of the carelessness and negligence of the plaintiff in the performance of its duties owed by it to him."

In its amended answer the defendant admits its corporate existence; that the engine described in the petition was used in interstate commerce; the maintenance of its shops at Heavener; the employment of the plaintiff and his injury while working on the defendant's engine. Allegations in the petition not admitted are specifically denied. Defendant further pleads:

"For further defense, defendant alleges any injuries to plaintiff mentioned in said petition directly resulted from and were caused by plaintiff's own negligence for the reason that plaintiff was an experienced workman, familiar with the condition and temperature of defendant's engine at the time he undertook to work on same. Plaintiff was also familiar with his own physical condition and knew the risks incident to working on said engine in his condition and in the condition and temperature of the engine. If there were any negligence on defendant's part, which defendant denies, plaintiff was guilty of negligence for the reasons stated in this paragraph, and such negligence contributed to his injuries.

"For further defense, defendant alleges any injuries sustained by plaintiff while he worked as a workman or boilermaker for defendant were the result of risks incident to his employment. Plaintiff was an experienced workman, familiar with the con-

dition and temperature of defendant's engine at the time he undertook to work on same, and of his own physical condition, and risks incident to working on said engine in his condition and in the condition and temperature of the engine, and he, therefore, assumed the risk of injuries incident to working on same."

The plaintiff's reply consists of a general denial.

From a verdict and judgment in favor of the plaintiff, the defendant appeals, assigning ten alleged errors which are presented under the following propositions: (1) That the court erred in overruling defendant's demurrer to plaintiff's evidence; (2) that the verdict is inconsistent with the instructions given by the court; (3) error in the instructions given and error of the court in refusing to give instructions requested by the defendant; (4) the court erred in excluding evidence offered by the defendant; (5) error in overruling defendant's motion for a mistrial; (6) that the verdict is excessive; (7) that the court erred in denying defendant's motion for a new trial.

On direct examination plaintiff testified that he was 47 years of age and had been a boilermaker in the employ of various railroads since 1918; that he had been employed as boilermaker by the defendant since October, 1922; that at the time of the injury he was in good health and capable of earning $200 per month. At about 10 o'clock p. m., March 12, 1937, defendant's passenger engine No. 807 (which at the time was being used "doubleheading" a fast freight train) entered the defendant's shop at Heavener, and, upon inspection in which plaintiff participated, it was discovered that one of the flues of the engine was leaking. That, upon the instruction and direction of H. H. Davis, defendant's roundhouse foreman, who had charge and direction of the work in which plaintiff was engaged, plaintiff, together with his helpers, "blew down" the engine of steam, which operation was completed about 12 o'clock midnight. Plaintiff and his helper ate their supper and returned to the engine at 1 o'clock. Further, plaintiff testified as follows:

"* * * And said for me to go ahead and get my tools down there on the job * * * he told me to go ahead and get my tools down there and he would be down there in a few minutes to see about it. Q. Had he indicated how he intended that work to be done, whether there would be anybody else working on the engine on which you were working? A. Not at that present time. When he came down he asked me if I run the boiler all over with cold water. I

said 'No, I put it up to the flue'—I was hooking up my air hammer and Williams was getting everything ready to run the flue up in front—and so he came back and told me to start cold water in the engine and run it over with cold water; so we started the pump again and started the cold water in there again and Williams came up and Mr. Davis and me walked around in front of the engine on to the left-hand side—he told Williams, my helper, to take a wrench and take two plugs out up towards the top of the boiler in front of the tap—that was to let the steam and hot water run out and Williams crawled up on the running board and taken two plugs out and when the water came up and run out through these holes and Mr. Davis and I were standing at the side, left hand sorta talking and he went back and I went back to where the water was running out at these holes and he asked Williams if the water was still hot coming out of the holes. Williams told him it was. We stood there I guess seven or eight or ten minutes passing our hands through the water—* * * and he told me it would be all right then to go ahead and shut the pump down. Said, 'Now I am going to take Mr. Murphy'—that's a pipe fitter—'and put in front end with an acetylene torch, while you go in the back—I will let Mr. Murphy go in the front end with an acetylene torch and cut that flue out at the front end and leave it back so you can pull it out through the hole in front,' and said 'I am going to supper now'—I said 'Well, wait, Mr. Davis, if you put Mr. Murphy in front—we haven't had the blower on there at all—if you put him up there now I can't use a blower on the front end —that will keep us from using a blower on the front end,' and he said 'You won't need a blower on the firebox for the time you will have to be in there, and while you are cutting it off in the back end, Murphy can be cutting it in the front end—that way we can get along faster. Q. What do you mean by 'blower'? A. That creates air— Q. How does it operate? A. Well, some places they have an air blower that's hooked up to the stack, but this engine didn't have —they haven't got any air blower—this engine was equipped for steam blower to come in from the left-hand side—that's a pipe about three-quarters or one inch that comes in from the left-hand side and about that high from the bottom part of the smoke box and the steam comes through from the stationary boiler when you open that up, hooked up, it goes into the—right straight up through the stack—up, it goes into the —right straight up through the stack— that creates a suction in the front end and pulls the heat out of the firebox, pulls the cold air into the door and gets fresh air in the firebox. Otherwise, the firebox just stands there with no circulation in it. Q. And you called his attention to the fact that with Mr. Murphy working on the front end it would be impossible to use the blower? A. Yes, for the simple reason this blower came in from the left side and the super heater flue on the left side he would have to stand over that hot pipe and work around it—it would be impossible to work over that hot pipe and burn himself with the hot pipe between the leak. Q. And after you called his attention to that, he said what? A. He told me I wouldn't need a blower in there for the length of time I would be in there —I wouldn't be in there very long. Q. In the meantime he had gone up on the deck of the engine and supposed to have examined the temperature of the box? A. Yes, he came back and told me to run it over with cold water. Q. Now, did you ever try to work in a firebox prior to that time when they had no blower of any kind. A. No, sir, not in my life."

Plaintiff further testified that he entered the firebox for the purpose of making repairs on the assurance of Davis that the firebox was cool enough for safety and that use of the "blower" was unnecessary; that on his first entrance he found the firebox hot, and after working therein ten minutes he became very hot and came out to cool off, returned to the firebox later and worked ten minutes more, and, upon coming out the second time, he was sick and vomited. That Davis inquired if he thought he could finish the job, to which plaintiff replied that he thought he could. In working on the job he entered the firebox four different times, completing the work about 6 o'clock a. m. the morning of the 13th; that he went home about 7 o'clock in the morning ill, called a doctor, and went to bed.

Dr. Millard L. Henry, a witness for the plaintiff, testified that he had known the plaintiff five and a half years; that at about 8 o'clock March 13th he visited the plaintiff's home and found him suffering from a severe attack of heat prostration; that he continued to attend the plaintiff until September, 1937; that he found plaintiff's physical condition bad and that it was doubtful if he would ever be able to resume his trade of boilermaker. Witness further testified that he had treated the plaintiff for a mild heatstroke in 1936; that following plaintiff's recovery from such illness he had o.k.'d him for work with the defendant; that he had, however, advised the plaintiff to assume a more leisurely attitude in his work. On May 13, 1937, the plaintiff executed to the defendant's claim agent the following statement, concerning his injury:

"Heavener, Oklahoma, May 13, 1937

"Statement of W. G. Hoyle, Boilermaker, in connection with his becoming too hot and being disqualified from doing further work as boilermaker.

"Mr. Hoyle says:

"I reside in Heavener and have been employed by the KCS Ry as Boilermaker working in the shops at this point.

"On August 8th, 1936, while working on engine 757, in the firebox doing brick work, I became too hot and was absent from work 57 days, I then returned to work on October 5, 1936 and on March 12, 1937, while working on engine 807 renewing superheater flues again became too hot and have not worked since that time. Went to the hospital at Kansas City and Dr. Miller disqualified me from doing further hot work, meaning work on the inside of fireboxes. * * *

"When working on 807, this engine came in doubleheading from the south either just ahead or just behind No. 16, when it was inspected in the house find it had bursted superheater flue, the engine had to get ready for No. 77, the next morning, I went to work on it about 1:15 a. m., the pressure had been blown down but the firebox was still hot. The engine was very hot when this work was done. When I went in to cut the head off the flue I got too hot.

"The foreman told me we had to get the engine ready for No. 77, as there was no relief engine here, I made no protest to the foreman in either case about the boilers or rather fireboxes being too hot.

"I have had about 23 or 24 years' experience as boilermaker, these times mentioned above were the first time I ever became overheated, of course, in August, the weather was very hot here, but in March the weather was cold.

"I have read the above and is true and correct.

"W. G. Hoyle."

We are first concerned as to the assumption of risk by the plaintiff, that is, whether, under the record, the defendant was guilty of primary negligence. In the syllabus in Chicago, R. I. & P. Ry. Co. v. Clark, 175 Okla. 70, 51 P.2d 539, we held:

"Where servant was employed as a flue blower to go into the fireboxes of master's locomotive engines, and with compressed air, blow the ashes, soot, smoke, and dirt from the flues, held, servant assumed the risks and hazards of his employment."

In that case, in the body of the opinion, it is said:

"'As construed by the United States Supreme Court an employee assumes the ordinary risks and hazards of his occupation and also those defects and risks which are known to him or are plainly observable, although due to the master's negligence.' Chicago, Rock Island & Pac. Ry. Co. v. King, 165 Okla. 169, 25 P.2d 304, 309; Arizona Copper Co. v. Hammer, 250 U. S. 400, 39 S. Ct. 553.

"'Where the conditions are constant and of long standing, and the danger is one that is suggested by the common knowledge which all possess, and both the conditions and the dangers are obvious to the common understanding, and the employee is of full age, intelligence, and adequate experience, and all these elements of the problem appear without contradiction, from the plaintiff's own evidence, the question becomes one of law for the decision of the court. Upon such a state of evidence a verdict for the plaintiff cannot be sustained, and it is the duty of the judge presiding at the trial to instruct the jury accordingly.' Butler v. Frazee, 211 U. S. 459, 29 S. Ct. 136.

"As stated by the court in Arizona Copper Co. v. Hammer, supra:

"'The rule existing in the absence of statute, as usually enunciated, is that all consequences of risk inherent in the occupation, and normally incident to it, are assumed by the employee, and afford no ground of action by him or those claiming under him, in the absence of negligence by the employer, and even risks arising from or increased by the failure of the employer to take the care that he ought to take for the employee's safety are assumed by the latter if he is aware of them or if they are so obvious that any ordinarily prudent person under the circumstances could not fail to observe and appreciate them'."

In Oklahoma City-Ada-Atoka Ry. Co. v Kirkbride, 179 Okla. 428, 65 P.2d 1021, we held in the syllabus:

"Under the Federal Employers' Liability Act (35 Stat. L. 65), 45 U. S. C. A., secs. 51-59, the servant, or employee, an experienced brakeman, is chargeable with knowledge of such defects in the construction of a sidetrack or switch as are open and obvious to his observation, or so patent as to be readily observed by him, or so plainly observable he must be presumed to know. If such servant has actual knowledge of the defective or negligent construction of such sidetrack out of which the risk arose and appreciation of the risk arising therefrom prior to his injury and continues to work for the employer, part of his duties being to set in and cut out cars at such sidetrack or switch, after such knowledge of the condition of said sidetrack, without objection, an injury due to such known risk is not actionable, and he assumes the risk notwithstanding his injury was caused by the master's negligent construction of said track.

In such case assumption of the risk is a matter of law for the court and not for the jury."

In that case we copied from decisions supporting the rule stated in 39 C. J. 684, as follows:

" 'Assumption of Risk,' in the law of master and servant, is a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee or servant agrees that certain dangers of injury, while engaged in the service for which he is hired, shall be at the risk of the employee or servant. The risks usually assumed by a servant are those ordinarily incident to his discharge of his duty in the particular employment, and those not ordinarily so incident but of which he has actual or constructive knowledge with full appreciation of the dangers that may flow therefrom. Under the so-called doctrine of assumption of risk the master is not liable for injuries from risks assumed by his servant, and assumption of risk therefore will, in the absence of statutory provision to the contrary, constitute a defense to an action by the servant against his master for damages occasioned by an injury from a risk assumed by the servant."

In Grosscupp v. Chicago & N. W. Ry. Co., 14 Fed. Supp. 276, wherein the facts are closely analogous to the facts in the present case, the court in the syllabus held:

"As respects employer's liability for injuries sustained by employee, as to what may be considered safe place to work and furnishing of safe appliances and tools, depends on particular circumstances.

"Experienced boilermaker, who was ordered by foreman to repair locomotive which was disabled while drawing train, held, to have assumed risk, precluding his recovery for injuries sustained because of necessity to change from extremely hot temperature in firebox to temperature outside while making repairs (Rev. St. Wyo. 1931 § 96-203)."

The case of Kentucky Utilities Co. v. Clayton's Adm'r, 28 S. W.2d 597, presents facts consistent with the facts of the case at bar. Therein, in the syllabus, the Supreme Court of Kentucky held:

"Employee dying from heatstroke on entering boiler drum held to have assumed the risk, notwithstanding superior's assurances.

"Employee assumed risk, since he was not entitled to rely on assurance of his superior to effect that heat in boiler drum would not affect his constitution, but was required to rely on his own knowledge of his powers of endurance.

"Where heat conditions were known to servant, servant could not rely on superior's assurance that heat in boiler drum would not affect servant's constitution."

In the body of the opinion in that case, the court used the following language:

"Many grounds are urged for reversal, but we need not discuss or decide any of them save the one whether appellant was entitled to a peremptory instruction or not. Appellant insists that it was on the theory that, in entering the boiler drum on the occasion when he suffered the heatstroke, Clayton assumed the risk of any ill effect of the heat. Appellee insists that appellant was not entitled to such an instruction, since there was evidence to establish that Clayton did not assume the risk mentioned because of the assurance of safety given him by Boyd, his superior. The proof establishes without contradiction that Clayton knew about the heat condition in this boiler drum. He had worked in this plant for over a year prior to the date of his death, doing the same character of work he was engaged in on the fatal day. It does not appear that Clayton had ever been in a boiler drum before the day upon which he died, but he certainly knew about how hot it was in the plant, and; being the intelligent man which the record shows him to have been, he must have known it was hotter inside the boiler drum than it was outside of it. He had been in the boiler drum and stayed in it for about 15 minutes before he ever reported to Boyd, and, on telling Boyd how hot it was in the drum, received from the latter the alleged assurance of safety upon which appellee relies. Of course, appellant denies any such assurance was given to Clayton, but, in testing the propriety of a peremptory instruction, it must be remembered that the jury had the right to believe that such an assurance was given, and, if so, the question is, Would a peremptory instruction have been proper under such circumstances? Possessing this knowledge of the heat conditions, did Clayton have the right to rely upon the assurance given him by Boyd that it would be all right in the drum after the fan had been rigged up? Boyd's assurance carried the two ideas of a reduction of temperature in the boiler drum due to the operation of the fan and of the effect of the temperature as so reduced upon the constitution of Clayton. We are not called upon to decide what effect this assurance with its double intendment would have had upon the rights of the parties had Clayton suffered a heatstroke upon entering the boiler drum immediately after he had received the assurance, for that is not the state of case here presented. He did not suffer a heatstroke until after he had entered the boiler drum, worked there for about fifteen minutes, came out, procured some tools, and entered it for the second time after the assurance of safety

had been given him. It is thus clear that he had ascertained for himself when he entered the drum for the first time, after Boyd had told him that 'it would be all right,' the extent of the reduction of temperature due to the operation of the fan, and that he knew when he entered the drum the next time, after having gone for the tools, how hot it was in that place. Hence, when he entered the boiler drum the last time, Boyd's assurance was reduced down simply to an assurance that such heat as was in the boiler drum would not affect Clayton's constitution. Under such circumstances, it is settled in this jurisdiction that Clayton, on entering the drum the third time, assumed the risk of the effect of heat upon his constitution."

See, also, Grammer v. Mid-Continent Petroleum Corp. (10 Cir.) 71 Fed.2d. 38.

We have examined the authorities submitted by the plaintiff in his brief and it appears that in a number of the cases cited the decision arrived at is based upon facts not in harmony with the facts in the present case. Perhaps the strongest case presented by the plaintiff is Albright v. Penn. R. Co., 16 Fed. Supp. 281. There the foreman ordered the employee to proceed hurriedly and alone to repair the heated locomotive boiler, which was filled with gases, and refused to furnish a helper as requested by the employee. Under the facts there presented, the Federal District Court held that the question of assumption of risk and contributory negligence was a question for determination by the jury under proper instructions of the court. However, in the body of the opinion, referring to the question of assumption of risk, the court said:

"Thirdly, as to the assumption of the risk by the plaintiff: The defendant contends that the plaintiff understood the danger of entering the boiler, and therefore assumed the risk. This might be true if the plaintiff had not complained to his foreman of the danger, requested a helper, and was ordered by his foreman to proceed hurriedly without a helper. Where the employer orders his employee to assume a risk and the employee follows such order, the employer cannot set up the defense of assumption of risk. Steele v. Erie R. Co., 54 F.2d 690 (C. C. A. 2); New York, N. H. & H. R. Co. v. Vizvari, 210 F. 118, L. R. A. 1915C, 9 (C. C. A. 2)."

In the present case it is argued that defendant was primarily negligent in not connecting and placing in use the blower attached to the engine; that the blower would have reduced the heat in the firebox. On this point, on redirect examination, the plaintiff testified as follows:

"Q. Now, counsel has asked you if you wanted to turn on that blower who would turn it on and I believe you answered you would? A. I could have turned it on myself. Q. Then he said to you, 'No one told you you couldn't turn it on'? A. No, sir. Q. Tell the jury what was said. A. The time I was working, my superior officer told me I wouldn't need the blower for the time I would be in the firebox. He was going to put another man in the front end. I couldn't use the blower because he was on the front end."

Clarence Williams, one of the plaintiff's two helpers, used as a witness by the plaintiff, testified that the fire in the engine was cut out before 10 o'clock on the night of March 12th; that water placed in the boiler of the engine came out cool, which indicated that the boiler was about as cool as it could be got; that plaintiff made no request of witness to turn on the blower.

Under the record it appears that the facts bring the present case well within the rule cited in Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, wherein it is said:

"When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employee assumes the risk, even though it arises out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employee, relying upon the promise, does not assume the risk unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise."

See, also, Blackley v. Powell (4 Cir.) 68 F.2d 457.

In the present action the defense of assumption of risk under the Federal. Employees' Liability Act was available to the defendant. Great Northern Ry. Co. et al. v. George Leonidas, 59 Sup. Ct. 51, 83 (Adv.) Law Ed. 81. See, also, Osage Coal & Mining Co. v. Sperra, 42 Okla. 726, 142 P. 1040. The defendant having asserted this defense, it thus became a matter of law for the court and not for the jury, and under the facts disclosed from the record the trial court should have sustained defendant's demurrer to plaintiff's evidence.

In view of our conclusion on the question of assumption of risk, it is unnecessary to

discuss the other questions presented by the defendant in the appeal.

Accordingly, the judgment is reversed with directions to set aside and vacate the verdict of the jury and the judgment for the plaintiff, and to render judgment for the defendant.

BAYLESS, C. J., and RILEY, CORN, and HURST, JJ., concur.